This is for the second session of the Honorable Justice James Fitzgerald V. Prosecutor's Office. Have a seat. You need an attorney to think with an argument and please step up. I expected about 50 of you to jump up. How are we doing this or how do we think we're doing this? First of all, there is no discussion on jurisdiction. That's decided, so don't waste your time. All right? Time, well, what do we think we're doing here? Your Honor, for the appellants, we would propose 20 minutes for collectively. I think it should be sufficient. Okay. For the appellants, what we discussed is I would present the main argument in about 10 minutes. You are? Austin Bartlett for Morgan Stanley. Say that again. Austin Bartlett and I represent the appellant Morgan Stanley. Following my argument, Mr. Matuschik, who is also a co-appellant who represents the estate of Mark Turek, Right. I'll present a very brief argument followed by. I'm Robert Sheridan, Your Honor. We represent the appellant. I know you. Thank you very much. Also, just two or three minutes to add one or two points to the argument. Okay. The only thing I would like to reserve two minutes for rebuttal. Well, as I say, we're pretty liberal. Okay. Okay. It's hard. You can call me and ask if you go to lunch. They said not. They may be not even for dinner. All right. Let's hear what you guys are going to say. Now, who have I got? I represent. I'm going beyond that. I represent Howard Levinson, particularly as a cross-appellant. Okay. Mr. Norenberg represents Howard Levinson as an appellee. He would respond to the arguments that you just discussed. He said no more than 20 minutes. Well, I think for this side, we have some more here as well. All I need is maybe 10 minutes. Okay. In a cross-appeal, Mr. Lavorie would argue that he is an appellant for the cross-appeal. And then Mr. Barnett wants to argue as the appellee on the cross-appeal. And we reserve five minutes for rebuttal. My name is Mary Kroner. I'm here on behalf of 02, who has recently granted our appearance. I have about 10 seconds with respect to one issue regarding a potential settlement that would occur and how that may impact the cross-appeal against 02. Okay. I guess I shouldn't have let you in, but I did. I figured if I didn't let you in, one of the agencies maybe can take the case. Okay. The other issue, as you know, there's an order on this file that says, no briefs or nothing filed until the outcome of this case. So after the outcome, then you can do your motions with Steve as to the other issues. Okay? All right. All right. Whoever is going to start, start. I think I have that pleasure, Your Honor. May it please the Court. Good afternoon, Your Honors. Good afternoon, Counsel. Austin Barclay on behalf of the appellant, Morgan Stanley. Your Honors, this appeal presents the issue of whether a flight instructor, Howard Levinson, whether he is insulated from his alleged negligence simply because that negligence occurred in the instruction and training setting. The trial court held that he was insulated under the educational malpractice doctrine and granted summary judgment without analyzing the facts purely based upon the proposition that any training or instruction allegations constitute educational malpractice and are foreclosed under Illinois law. Appellants assert that the trial court's decision should be reversed for two reasons. First, under Illinois law, negligent training and negligent instruction are cognizable under existing negligence law. So the court's characterization of educational malpractice is erroneous. Secondly, the educational malpractice doctrine, if it were to be recognized in Illinois, should be confined to traditional educational institutions and purely economic harm cases as opposed to death case like we had before us. Turning to the first point, under Illinois law, if a person or entity undertakes the obligation to train a person in how to operate a machine or vehicle such as an airplane, they have an obligation to carry out that duty in a non-negligent manner. The case of Cressus v. Sears Roebuck is informative in that regard. In that case, a plaintiff filed suit against Sears and its employee because a Sears driver backed the bus out of the automotive center and hit the plaintiff, causing her personal injury. One of the allegations against Sears was, you negligently trained and instructed your employee how to drive out of the auto center. And the jury rendered a verdict against Sears. Sears appealed. And Sears went before the first district in 2000 and argued that the allegation of negligent training and instruction shouldn't stand. This court affirmed the jury's verdict. This court held that it was appropriate for the jury to decide the issue of negligent training and instruction, that there was sufficient evidence in the record to sustain the jury's verdict. In this case, Howard Levinson provided flight instruction to Mark Turek regarding the specific accident aircraft, the Cessna 421, on three occasions within three weeks of this accident going over the island. Yeah, but what's the difference between the school and the individual? Say I'm a teacher at Lewis University, and then I own a business on the side. What's the difference? Well, I'm glad you raised that question, Presiding Justice Smith. There's a fundamental difference. The difference is an entity like Lewis University, there's issues of academic freedom. There's issues of an actual curriculum that a professor developed or that a school has approved. In this case, Howard Levinson, this wasn't a classroom setting. This was in-flight training. So there was no developed curriculum. There was nothing with academic freedom. And the big concerns that cases, traditional educational malpractice cases, get into are having courts overseeing public or private universities and overseeing day-to-day teaching and there being a glut of lawsuits in the courts saying that they didn't receive a quality education. Here, it's fundamentally different, not only because you have a person teaching one person, Mark Turek, regarding one aircraft, the accident aircraft, regarding the airport where this aircraft crashed on approach and was teaching him how to land in that aircraft and approach mechanisms within two to three weeks before the accident. So what is different from a Lewis University case is that, one, the magnitude of harm. We're not talking about disappointed financial or economic expectations. We're talking about physical harm and death. And secondly, that there won't be the onslaught of the judiciary over having to oversee traditional educational institutions and concerns about academic freedom. And the trial court here broadly held that the educational malpractice doctrine prohibits any allegations of negligent training or instruction to go forward. I mentioned the case involving Sears that this court had affirmed. But, Justice Smith, the question you asked about what's the difference here, it brings up the case of Ross versus Creighton University. And that's a case where the Seventh Circuit predicted that Illinois wouldn't adopt the educational malpractice court in that context. And that context was a basketball player who got a scholarship to go to Creighton University, graduated with a fourth grade reading level, had trouble getting employment, and later filed suit against Creighton. The Seventh Circuit had serious concerns about it and affirmed the dismissal from the district court. And the reason it did it was, one, it was a traditional educational institution. The court was concerned about judicial oversight of the curriculum, that there would be courts rather than schools determining the context of curriculum, and that there would be a tremendous exposure to the school system generally. You can contrast that case, which involved essentially someone complaining about a poor education that resulted in economic harm, with a case like Doe versus Yale University, Connecticut Supreme Court case. That was a case where a medical student alleged that they were trained improperly, and while doing a catheterization procedure, pricked their finger and contracted HIV and sued Yale University. Intelligently, the Connecticut Supreme Court held this case is an educational malpractice. It involves whether Yale University was negligent and caused physical harm to another person. And bringing it to the aviation context, the case that we believe is the template that this court should follow, and is, we believe, a proper assessment of the competing interests here, is the case of in-ray air crash at Clarence Center, New York, a case of the Western District of New York in 2007. You indicated that may have been remanded for other purposes. Not that case. That was the Glorvigin versus Cessna case. But the case, the reasoning, at least as of today, the reasoning in the Western District of New York case stands. And the reasoning in that case is, in that particular case, what happened is a state of a deceased pilot filed suit against flight safety, an actual flight school, and argued that the flight school should be held liable for not training the pilots regarding icing characteristics and aerodynamic stalls. And flight safety, much like Mr. Levinson and the flight schools in this case, that's educational malpractice. It relates to negligent training and instruction. And the Western District of New York looked at New York case law, which, unlike Illinois, has addressed educational malpractice. And the federal district court held that this case is not appropriate to recognize the educational malpractice doctrine. And really focused on two reasons. One, that it doesn't involve a traditional educational institution. Unlike a public or private university, concerns about academic freedom, we're dealing with a private corporation that's training adult specialized individuals regarding operation of one aircraft. And the court found that the concerns regarding teaching children as a whole, or the school system in teaching children, were fundamentally different than teaching airmen. And so the court declined to recognize the educational malpractice doctrine and really differentiated cases like Ross, which involved economic harm, from cases where there's alleged bodily injury or death, like we have here. And we urged the court to adopt that approach, that the line, this should be, if Illinois is going to adopt educational malpractice, it should be confined to traditional educational institutions and cases where there's alleged economic harm, like Mr. Ross in the Creighton University case. But when it involves considerations of physical harm, and particularly when it involves someone like Mr. Levinson and his company Hart Corporation, that aren't actual schools, it is error to apply the educational malpractice doctrine. And we recognize that there have been other courts that have applied the educational malpractice doctrine to flight schools. Counsel has cited the Chesley case, which was against Cessna, and involved a claim for not training pilots regarding emergency procedures when an exhaust system fails in an aircraft. And in that case, when they upheld the application of the educational malpractice doctrine, the court said schools, as opposed to courts, should decide the content of the curriculum. And secondly, that it was dealing with the curriculum. Here we don't have an actual school. We have an individual, Howard Levinson, who's not grading someone. It's taking place in an airplane, in flight. And the court's not having to weigh in on a curriculum. It's fundamentally different. And I think it's important to emphasize the far-reaching implications of the trial court's decision here. If any negligent training or instruction allegation is deemed educational malpractice, concepts, the suit that I mentioned earlier, Pressman v. Sears, where Sears was sued for respondeat superior because of negligently training and instructing its employee how to drive a van out of an auto center, those claims are going to evaporate, potentially exposing the public to significant risk of physical harm. And there is not a good policy reason to go that route. We ask that this court reverse the trial court's August 5, 2010, and September 27, 2010, summary judgment orders and find that the educational malpractice doctrine does not apply to this context where it does not involve an educational institution or a school and allow these claims to proceed before a jury where they belong. Thank you. Thank you. Thank you. May it please the Court, Edward Matuszek on behalf of Appellant Defendant State of Turok Counsel, Mr. Levinson. Just a few words, Your Honor, on the current posture here, and I know, Justice Smith, you indicated everything else has been stayed until this has been resolved, but I do want to point out as to Appellant Turok, I understand as of Friday that we may have settled many of the other issues in the case other than contributions. I think, I don't know if it was you, somebody called the clerk's office indicating there was possibly some movement. That was not me personally, but it was a group of us, yes, Your Honor. At any rate, what we're down to here, as you know, is an interlocutory appeal which is in, near as I can tell, going to affect only the Garland case, which we have already gotten summary judgment on July 7th of this past year on the basis of the exclusive remedy provision of the Workers' Compensation Act. So unless that decision, which is currently pending under 11-2121 and 11-2199, is somehow reversed and the summary judgment that Turok has obtained is not upheld, this doesn't even become an issue. So we're clear as we go forward here. So this is not only an interlocutory appeal, but it's really contingent upon that which has been stayed. Nonetheless, to get us back on track, I think what was ignored and pointed out by Mr. Bartlett too in the trial court was what is in the record here, and we really haven't focused on that. This is not, as much as people have tried to make it out, and certainly not as to our appeal, a case about educational malpractice. We brought a contribution claim based upon common law negligence principles. Why is that? Because if we look at the record, we see that Howard Levinson was the owner of Hart Corporation, which was a co-owner of this aircraft involved in the crash. This was a specific type of aircraft, Your Honors, and this was, as Mr. Levinson stated in the record at C-445 on, the subject Cessna has geared engines. That means that, in layman's terms, the propeller is operating at about a third of the speed of the engine. As a result, in Mr. Levinson's own words in his deposition, again in the record, you can't make quick movements of the throttle on this plane. You have to know how to handle the engine because it's an important part of flying the airplane. Probably the only difference between that airplane and Mr. Turret's Baron, which he was familiar, is how you handle the engine. That's in the record. Mr. Levinson volunteered as a flight instructor. He didn't receive payment here. He was an owner, in essence, of the aircraft through his ownership of Hart, with particular peculiar knowledge of how this plane was different than other planes, in particular the plane that Mr. Turret was familiar with. What we would have not mentioned in our written briefs, and I want to make sure the Court is aware, since we have a de novo review here, there are other aspects of the record that create disputed issues, material facts that show why this is common-law negligence. And, again, Mr. Levinson stated at C-4, 5-5, and 5-6, you have to be careful not to chop the throttle quickly. It's a safety issue. You could have catastrophic problems if you chop the throttle. And what also wasn't brought out in the written briefs, and I want to point out to the Court, just a note in the record, as to why this is a common-law negligence case, I asked Mr. Levinson, did you ever have a conversation with Mark Turret about not chopping the throttle when he had his training event? Mr. Levinson said, this is at C-843. I don't recollect any conversation about that. So despite the fact that there was knowledge of a safety hazard, peculiar knowledge, even apart from certified flight instructor issues or federal air regulations or anything else, from common-law negligence principles, the fact that you had someone who volunteered to train, who acknowledged he knew of a potential safety hazard and never even mentioned it to the person he was training, creates a disputed issue of fact that should have gone to the jury. We should never even reach the issue of educational malpractice. And that's why this is not going to cause inconsistent issues with this cross-appeal with flight schools and everything else. This is a different set of facts on the record, and that is what we're here about. We have the trial court just take, in essence, an approach of obvious issue judgment on the pleadings. I'm going to be the TSA, one size fits all, although I see in the news today they're finally modifying their policy. But you can't let go forward any situation in a precedent hearing that says any time I see the word instruct or train, I'm automatically granting summary judgment and ignore the facts on the record. Those facts I've pointed out to the court, and I would hope we take those into consideration as to why there was disputed issues of fact on ordinary negligence principles here. And that's why in the event the workers' compensation sole remedy issue is not resolved in our favor, then we would ask that this be reversed. Otherwise, this would be moot. And that's all I had briefly. Thank you. When you say the word compensation, what is the status of it? I'm sorry. There were two issues, one for Morgan Stanley and as the employer. The other is following established case law with Turek as a co-employee of Garland. Same basic sole remedy provision. That is on file, as I cited to the appellate cases that have been filed, and, Your Honor, as indicated, that has been stated at this point. So until we can brief it, I can't tell you much more.  Mayors, mayors, mayors, mayors, please. Bob Sheridan, I'm representing the Garland estate for a group of law officers. This is not a case that's going to go away from us, for us. We have an interest in the outcome of this case, regardless of how the other case settles. In fact, if my co-appellants here get what they want, this case becomes all the more important to us because it becomes one of the few sources of recovery for our client. So let me make it clear. So you're saying either way. Yeah, either way, the Garland estate is interested in this recovery. We have a direct claim against Mr. Levinson, against Hart Corporation, his principal. And so, therefore, we encourage, Your Honor, to do as it's clear to me that Your Honor is meaning to do, consider this issue seriously and as a matter of importance because it's certainly important to us, no matter what else happens in the case. I endorse and agree with all that Mr. Bartlett has said with respect to this court and its treatment that it should make of the educational malpractice doctrine. I have only a few things to add. Some of those things that I plan to add I'm not going to add because Mr. Bartlett has covered them admirably. But Your Honor asked the question, and I think perhaps I have a different answer to that question than the one that Mr. Bartlett gave. Your Honor answered, well, what if a fellow who is a teacher at Lewis University or some other school goes out and gives instruction to somebody outside of that context? Wouldn't this educational doctrine apply? And he's a teacher. And if it doesn't, why doesn't it? And I say whether it does or whether it doesn't depends very much on the character of the instruction given. The policies that have been applied to this issue have largely concerned institutions, and therefore they have considered instruction given in a certain way, in the institutional way, that is to say general instruction given generally. That is the reason I submit that cases like the federal case, the Clayton case, Ross v. Clayton, said that it was, what is the term they used, it was virtually impossible to establish causation. Why? Why should it be impossible to establish causation? I agree that it is, but if we look at why it is, I think we'll learn something significant with respect to the issue of this case. When we talk about causation, we talk about proximal causation, we usually talk about a couple of things. One of them is that it's a direct and foreseeable consequence, not something unusual. So if in the context of a medical school, for example, very bad training is given, really bad training, objectively bad training is given as to surgery, then it's foreseeable, is it not, that the people who receive that training later in life aren't going to do good surgery. That's the natural foreseeable consequence. But stuff happens in between. They're interns, they're residents, they have to pass their boards. The problem with the situation, the reason that the courts say that you can't establish causation is really because of a different doctrine that plays into it, and that's the doctrine of remoteness. It's too remote, the failure is too remote, too far, it's not proximate enough, for the law to allow such an act to be the legal cause of the subsequent condition. So you're going to Burger King. Oh, yeah. I've got to ask you how Hills and Sons and McMurrow distinguished, but go ahead. I'll get there when you get there. Okay, so here's what I think about this matter. If remoteness is really the basis, the policy that this educational malpractice doctrine turns on, apart from the other ones, apart from the state controlling education and whatnot, then clearly it doesn't apply in this case where an individual is giving training on the use of a particular item, whether it's a school bus or an airplane, or a neighbor showing another neighbor how to operate a saw so he can lend it to him so he can cut trees, and then with the expectation of turning the keys over to him, forthwith. That is not a matter of remoteness. That is clearly the concept that animates the educational malpractice doctrine, that it has caused courts to say you can't possibly establish causation, does not exist in this context. But how do I distinguish him from the other instructors? I mean, you're saying the latest one, and you're saying this was playing a specific instruction. Yes. But how do we know that that was the cause and effect? How do we get there if we've got three other instructors out there? Oh, that his was the cause? It doesn't have to be the cause. No, it needs to be a cause. That's number one. Number two, that's a question for the jury. And in this instance, as Mr. Matusek pointed out, the record shows in this case remarkably that Levinson was personally aware of the very deficiencies in Mr. Turek's mindset and experience that were known to cause this accident from what they saw at the airport. According to Mr. Levinson's own testimony of somebody, Levinson had said that Mr. Turek drove his airplanes like a race car. He drove them fast, and then he hit the brakes. And then here at the airport, all of a sudden he's coming in at 84 miles an hour when he's got to come in, I'm sorry, not when he has to come in in excess of 100. There it is. So I'm not saying that Mr. Levinson should be found guilty. I'm saying that it's a matter that's worthy of being tried. But also I would ask the court to state the rule now, today, in this case. I don't know that a better opportunity will arise that this educational malpractice doctrine, which would be real clear if it was called the educational institution malpractice doctrine, does not apply to an individual, to a person who is giving training to another, instruction to another, with respect to something, a machine of any kind, with the intent that they're going to give it to them to use. That's simply not remote. And all of the policies that underlie this doctrine have disappeared in this circumstance. Talk about the can of worms. Talk about the parade of horribles. Imagine the consequences of being able to excuse every kind of instruction and failure to warn and those things just because they are instruction. Because that effectively is the bright line rule that the trial court has created in this case. If it's instruction, it is not actionable. I don't think that is the law. And I ask your honors to make it clear that it is not. Your honor, do you have a question? I thought in reading some of the cases and some of the articles on educational malpractice that one of the considerations was the fact that there was a sort of vetting process for the people that were hired to do the teaching or the instructing. There were peers. There was a resume process. There was a selection process. You could get fired. And that was one of the things that the courts didn't want to get involved in was how educational institutions set up their hiring practices and their monitoring practices and their reviewing practices and their evaluating practices of their instructors, that they're really capable of doing that. Whereas for these, for certainly in a case where you have one person who is holding himself out to be an instructor of another person, he's just going out there saying, I know how to do this job. Nobody is really vetting that. Nobody is saying, yep, we agree, he knows how to do it. That's a very good point, your honor, very, very true. But understand that even as a volunteer, Mr. Levenson is acting as a volunteer, but Illinois law is clear that volunteers must still act reasonably. Even as a volunteer, the purpose here was to show him how to run it so he could buy an interest in it. This is not anything like, not only is he not an institution, it's not even an institutional or educational kind of purpose. It's the hands-on, let me show you, so that I can give it to you, or you can buy it. So that would be our request that the court reverse, and that it take the opportunity to make that part of the doctrine clear. To the extent that Illinois is going to have doctrine, I think that it should be made clear that it doesn't apply to a situation such as we have this. I thank you, your honor, very much. Thank you. Are you ready? I'm ready. Good afternoon, your honors. Norman Larum, on behalf of Howard Levenson, is an appellee in this matter. I probably should have taken a little longer than ten minutes, but I will try to move through my points as quickly as I can. Thank you. We're not going to let you down. With respect to your honor's last question about vetting, as we covered in the briefs, Mr. Levenson is a certified flight instructor. He is certified by the FAA. He has been vetted by the FAA because the FAA makes sure that he is qualified. He has to take periodic tests. He's got to go through periodic education. He has to demonstrate periodically, according to FAA regulations, that he is qualified to be certified by the FAA as a certified flight instructor. In this particular case, he spent five hours on three different occasions with Mr. Turek to satisfy an insurance requirement so that Mr. Turek could fly the aircraft. He was evaluating more than training. He was evaluating, but the insurance requirement was that a CFI sit in the airplane and evaluate. But the point I want to make, which is the point we made as strongly as we could in the briefs, is that there is no difference between Mr. Levenson and a flight school like RTC or Aero, because the instruction in the flight schools are actually given by CFIs, certified flight instructors. What is taught at a flight school must be taught by an individual CFI whenever an individual CFI gives instruction to a student pilot in an aircraft. Those instructions are regulated by the FAA. It's all in the FARs as to how they should proceed, what they should teach, how they should teach it. Mr. Turek, in this case, owned a multi-engine aircraft. He owned an aircraft with two engines, and the FAA did not treat the aircraft that he owned with the 421 aircraft in this case. The FAA does not make any distinctions. So Mr. Turek not only received the evaluation from my client, Mr. Levenson, in those five hours for insurance coverage purposes, but he also received two different sessions from two different schools, and they passed him. They said he successfully completed specific instruction on a 421B. But the instruction is the same. It's regulated by the FAA. The courts that have looked at flight instruction cases as well as other types of educational malpractice cases have concluded that as a matter of public policy, and there are four basic reasons, the Ross Court, the Seventh Circuit Court of Appeals, articulated those four reasons, which is in all the other jurisdiction cases, that there are really good, sound, and wise public policy reasons why the courts should not involve themselves in double-questioning the standard or the quality of particular education. How can you distinguish between general education or general training and specific training? Do the courts want to get involved in aviation, which is highly regulated by the FAA, and start second-guessing the regulations, the step-by-step procedures required by the FAA and these instructors? You know, there are licensing tests. There are continuing education requirements. There are tests to be taken by the pilots. There are certain instruction procedures that need to be passed with a certified flight instructor. Now there are flight simulators, which are better than airplanes, and actually training pilots how to fly particular aircraft, and they are watched, observed, their actions are watched and observed, and they are graded by a CFI. So you're basically saying there is no distinction. There is no distinction. That's what I'm saying, Judge, yes. There is no distinction. It's important to look at the claims here. You know, to say that these are common law negligence claims, I mean, you can dress it up any way you want to, but the claim, the nature of the claim is important. It's the same type of claim that the courts of other jurisdictions have termed or viewed as educational malpractice, which is simple. Is a teacher legally responsible for the injuries suffered by a third person caused by the negligence of the pupil after the pupil has left the control and supervision of the teacher? That's really the question. That's really the claim. And when you take a look at the Morgan Stanley brief, you see all the allegations set forth and all the different counterclaims and the complaints here. It's all failure to provide adequate training, very general allegations about teaching and training. And they're saying, what they want to say is that my client, Mr. Levinson, is legally responsible for Mark Turek coming in on that final approach and taking that airplane, a multi-engine airplane that he's flown. He's got 1,200 hours in a multi-engine airplane. He's landed hundreds of times in airports. He's landed at night. He's landed at day. He was one of the few 9-11 civilian pilots to do rescue in New York City. He is an experienced pilot. But on this occasion, what did he do? He turned that airplane a little bit too steeply, and the aircraft lost lift, and it spun to the ground. Now, why is it almost impossible to determine proximate cause? And why isn't it worthy of trial? Because we can't get into the head of Mark Turek. We don't know what went through his head in those few seconds when he made his final approach because a million things could have happened, a hundred things could have been going on in his head that had nothing to do with the enormous amount of training that he received from all of his schools and from Mr. Levitin, certainly, in those parts. What about their argument, basically, simplifying it, the Burger King argument? Well, the Burger King, if I remember, has the four factors of determining whether or not there's a duty. Foreseeability. Right. This isn't a duty case. I mean, the trial court made that. Why is it not? I mean, taking the Burger King case and taking both the majority and the minority, to me it came out almost even. It depended on when the issue becomes a matter of law. It's a public policy case. Right. It's a public policy case. It's not a duty case because those factors are applied when there is no public policy against the particular kind of claim. And the trial judge made that very clear. He said, I'm distinguishing all those training cases in the employer-employee context. And why? Because the employer has a duty to the public it serves. Because if it's going to provide a service or a product to the public, then it better well give its employees adequate training because that's its business. In its capacity as an employer serving the public, it has a duty to do that. It has a duty to take care of the public when the public buys its service or buys its product. Here we have a teacher. The question is whether or not the teacher should be liable to a third person as a result of a pupil's negligence who is outside the teacher's supervision and control. And as a matter of public policy, for the four reasons, the lack of a satisfactory standard of care to evaluate the educator, the inherent uncertainty about causation, the potential for a flood of litigation against teachers, the possibility that the claims will embroil the courts into overseeing the day-to-day operation of particular kinds of education or schools or teachers, and there is no difference between a teacher and a school because a school is full of teachers teaching pupils. There is no difference. And so it's really that duty case, the Burger King case, doesn't even, it's not even an issue. It's purely a premise liability. That's right. It's not even an issue. This is a public policy case. Are we going to let this genie out of the bottle? And I respectfully submit this is not a friendly issue. This is not a friendly genie. The public policy has really been set by the Illinois Supreme Court in the Lewis case. In the Lewis case, the Illinois Supreme Court said the courts should not get involved in second-guessing the quality of education, the philosophy of education. We've got, the state has licensing procedures for all kinds of professions, for all kinds of occupations. People have to take licensing exams. Well, does that cut off the bad instruction, the specific instruction, because somebody passes the licensing exam? I mean, this opens up a Pandora's box, which is really not good public policy, which is why the courts in other states who have considered this have adhered to these four factors and have said for this particular kind of claim, not in the employer context, not in the ownership context, but only in this context, the teacher is liable or should be liable for the injuries suffered by a third person, by the negligence of the student, when the pupil or the student is away from the teacher. In every one of these cases, like the Sears case, that's an employer case. You've got the supremacist liability case. The capacity of the defendant is what is an issue, and the duty arises from the capacity of the defendant. The duty arises from the capacity of the defendant, and that's easy to deal with. That's easy when you take those four duty factors in Burger King and apply it to that situation. Is the car going backwards or going forwards? Are you on the premises or aren't you on the premises? Do they know that patrons are going to be standing behind this vehicle or not? Did you teach the employee how to drive the truck or not? The employees are under the supervision of the employers and can be fired if they don't perform their job. In this situation, when the pupil is gone, the teacher can't fire the pupil when the pupil is flying the airplane with other people in it. He can't correct the pupil. I think there are very strong reasons why Illinois should follow other states and not recognize that this type of claim is a viable tort claim. By the way, just to conclude, with respect to the ownership and the volunteering, there's two points I do want to cover. Allegations against Mr. Levinson arising from his ownership of the airplane, including in particular the negligent entrustment count, which stayed the case. The trial judge, when he made this ruling, did not affect that claim. As a matter of fact, later on August 11th, I believe, or August 10th, August 11th of last year, on motions for summary judgment, the trial judge did dismiss those claims after examining the facts and held that after a thorough examination of all the facts and all the documents and all the records, the trial judge said there's no basis for that claim, and he granted summary judgment to Mr. Levinson on the negligent entrustment claim, which arises from the ownership. But this claim, i.e. not teaching Mark Turek something, whatever it is, that caused the crash, does not arise from ownership, does not arise from ownership. All the ownership-related claims stayed in the case, were tested on motion for summary judgment, and they lost because the trial court found that there were no facts that could sustain that claim. With respect to volunteering, that issue really wasn't covered below. There's a 2011 Illinois Supreme Court case called Bell v. Hudson that examines the restatement on duties arising from a voluntary undertaking, and the Illinois Supreme Court basically takes a very narrow and conservative view on voluntary undertaking. And that case involved whether or not parents providing or giving a private party and providing alcohol to a private party should be liable to a third person after, or maybe to the young man who drank a little bit too much and ended up in a fatal car accident. And the Supreme Court said no, not on the criteria. So even though that issue wasn't briefed, I just wanted to mention the Bell case because I don't think it applies here. It's really an educational malpractice claim. It's the nature of a claim that was addressed by the trial court, and the trial court held that Illinois has not recognized that claim as a conducible, viable tort in Illinois, and this court should affirm and adopt it as public policy. Thank you. Thank you. Why don't you wait? Then we'll better understand if something else floats up. Good afternoon. I'll present on behalf of the cross-appellants the main argument. My name is Mike McGorry. I am the attorney for the estate of Knudson as a cross-appellant. I'll also be speaking on behalf of Robinson and HK and Sybris as cross-appellants. Our position is that we agree with what Judge Selganic did below. We agree that there should not be a cognizable cause of action for educational malpractice. However, should this court disagree and reverse what Judge Selganic did, we have filed this appeal to protect our rights of contribution against RTC and Arrow. And the important point I want to make there is that, and you touched on it already with the previous arguments, there is no difference between RTC and Arrow. Every state that has considered the issue of whether or not to bar educational malpractice cases has decided that such cases are barred based on the public policy reasons. There's been another dozen cases since the Creighton University case in the Seventh Circuit. But more importantly for purposes of this appeal, of the cross-appeal, is that there's no precedent suggesting that any sort of different educational institutions or teachers or educators or instructors should be treated differently. There's no cases holding that some educators are entitled to the protections of the bar and some educators are not. RTC and Arrow don't make that claim. In fact, the courts have found trade schools that offer specialized education, flight schools in the flight safety case, the Baltimore motive case, the Page case in Michigan, they have all allowed the educational malpractice doctrine to bar educational malpractice claims in those cases. Rather, what these cases teach us is that you don't look to the nature of the defendant. You look to the nature of the claim asserted against the defendant. If the claim challenges the effectiveness of teaching, if the claim raises questions about the reasonableness of an educator's conduct in teaching, if the claim requires an analysis of the quality of education, that claim is a claim for educational malpractice and should be barred based on the policy reasons that Mr. Larum went into. The claims here against Levinson and the claims in contribution we made against RTC and Arrow are all the same. They implicate those three areas that I suggested. The claims are essentially that someone, whether it's Levinson or RTC or Arrow, provided negligent instruction to Mr. Turek and that's why the airplane crashed. Well, if those claims are allowed to proceed against Mr. Levinson, they ought to be allowed to proceed against RTC and Arrow as well. And if there's no questions, that's all I have. All right. Thank you. Thank you, Your Honor. Good afternoon, Your Honors. My name is Charles Barnett. I'm counsel for Recurrent Training Center and I just have a few brief comments. I'd like to begin with our educational malpractice discussion from the perspective of a flight school. The education malpractice doctrine is not a doctrine of immunity, but a principle that's totally seated in common law and common sense. That's why 27 states have already said that educational malpractice is not a cognizable tort. You simply can't blame your teacher or your school for what you fail to do after you graduate and leave the school. In common law, you have a duty and the duty cannot be an impossible duty. In teaching, a teacher cannot ever be sure if a student really understands what has been taught because no one can read another person's mind. It's not like checking to see if a file has been downloaded into your brain.  A teacher cannot have a duty to teach everything that a student may encounter because even a teacher does not know every possible combination that a student could encounter. For example, if a driving school, should they teach to stop at a stop sign? Should they teach to stop at a stop sign at the bottom of a hill? Should they teach to stop at a stop sign at the bottom of a hill at night? At the bottom of a hill in the rain? That list goes on and on. With the current training center, and especially in aviation, there's an infinite number of possibilities that could be conjured up. For instance, if we're trying to train a pilot for engine failure, should that be an engine failure at 30,000 feet? Should he learn how to handle an airplane with an engine failure at 20,000 feet or at night or in icing conditions or in a steep, heavy crosswind? The combination of possibilities is endless. It's simply impossible to anticipate every possible combination. In the case of Recurrent Training Center and other flight schools, that would involve teaching items that are beyond the practical test standards. The practical test, the PTS, is a guide that the FAA publishes to ensure that pilots are trained to a proper standard. But, of course, there's those who want to sue the teacher, and they'll always play the role of a Monday morning quarterback and say, if the teacher had only taught this or if they'd only taught that combination, we wouldn't have had an accident. And further, what about the prerequisite knowledge just to enroll in these schools? Almost every course except kindergarten has a prerequisite that a student has completed another class. In this case, the pilot that came to Recurrent Training Center already had a multi-engine certificate issued by the FAA. In Ross v. Creighton, Ross had to graduate from the 12th grade to get into Creighton University, and then he alleges that he did not have a fourth grade reading comprehension level. So does the school have a duty to teach what we're already supposed to know? Does the teacher have a duty to ensure the students remember what they're taught? And does the teacher have a duty to teach everything? Does the school have a duty to supervise all their students for the rest of their lives? In the Pempick v. Sickler case, this court already said that the union that was involved in training, that provided training to Pempick, did not owe Pempick a legal duty. And this court also said that the union had no control over the work site. Two similar factors here. This is just one of the issues for not recognizing education malpractice as a tort, because a teacher of a school has no control over the activity or actions of their former students after they graduate and leave the school. The purpose of teaching and education is to provide the students with the knowledge and fundamentals so that the ex-student, once the student leaves the facility, can go out into the world and make their own decisions, and make sound decisions and use good judgment in whatever activity or trade they're engaged in. So in the end, the common law says you can't hold a teacher of a school responsible for what they have no control over. Once the ex-students go out of their own, the umbilical cord has been cut, the teacher no longer controls the student. And further in the field of aviation, Congress has enacted extensive legislation and created the FAA. The FAA has developed not only regulations, but entire policies that are used to train and evaluate its members, its aviation-related persons. Those policies include advisories, circulars, training directives, the practical test standards that I mentioned earlier, and included in that is a constant, recurrent evaluation of its certified flight instructors and their flight schools. So then we ask, why should it be impossible to establish causation? Because pilots, interestingly enough, have been trained to evaluate not only the airworthiness of their airplanes, but their airworthiness of themselves. A pilot has to ask himself, do I have any distractions that are going to prevent me from flying safely, such as trouble at home with my spouse? Is my mind on something pressing at work? Do I feel ill, like I have the flu? Have I recently taken any other medication that might impair my ability to fly safely? Have I recently consumed alcohol? There's several distractions that are non-aviation-related that a pilot must safely evaluate before he gets into an airplane. Those factors simply can't be anticipated by an instructor prior to leaving the school. To allow educational malpractice in an incident like this is not only a problem in aviation, it's a problem for every other industry and it opens the floodgates for future litigation. Finally, our traditional schools teach many things that involve physical harm. High schools have the driving school. There's schools that teach swimming. There's woodshops that teach how to use the dangerous equipment. And in Illinois, we have two universities that teach aviation.  Educational malpractice should not be recognized as a cognizable tort in Illinois. Thank you, Your Honors. Thank you. Good afternoon, Your Honors. Mary Cronin on behalf of AERO2. I'd like to adopt the arguments set forth regarding educational malpractice and that it should not be a cognizable cause of action in the state of Illinois. As I mentioned earlier, we did recently file an appearance. I was also informed as of yesterday that there may be a settlement between Watt and Knutson. If that is the case, Your Honors, AERO2 was voluntarily dismissed in the Garland case. Therefore, it is our argument that we cannot be across Appellee if the only remaining case is the Garland case. So that's the only argument I'd like to set forth, and thank you very much. Thank you. Yeah, one more. I said I'd let everybody have their shot. I may be sorry, but... I'll be very brief. This is taking the position of the rebuttal and that cross-appeal. So it's a rebuttal, really, to things that have been said previously, and I'll limit it to that. And I'll address the court's questions as well, and then be done. First of all, I'd like to discuss the settlement that Ms. Cronin just brought up. And Your Honors asked about the settlement. How does that impact this case and this appeal? I'd like to mention that. I participated in arranging that settlement. There is a settlement, and we agreed on it on Monday. And then the court was called by my co-counsel who made the settlement with us. Here's how it impacts this. This appeal arose from three cases, the Garland case, the Watt case, and the Knutson case. All three of those cases were persons who were killed in the plane crash. And Garland is the only plaintiff here. The other two cases came up on appeal on the counterclaims. And Garland's case is truthfully still here as a plaintiff. But those other two cases were the ones that were settled, the Watt case and the Knutson case. And that settlement was trading the dropping of many appeals in return for the trading of other people's appeals. Appeals for appeals. And those are many of the appeals that have already been taken and that have been stayed. And those have been settled and are going to go away when these documents get signed and when they get done. And we will further apprise the court here because I think it's important here because some of your claims that you have here are going to go away. And the two of them are the claims brought in contribution by Morgan Stanley and Turek, who argued here, in Watt and in Knutson. So that everything that will still be before this court will only be pursuant to the Garland case. Garland case will still be here and need to be ruled on. Garland obviously is a plaintiff who is making educational malpractice claims and the cross claims that are based in educational malpractice. Those cross claims, however, I want to mention this, actually are contingent cross claims because the parties that are making those cross claims in July of last year won further by the workers' comp bar, which was mentioned to you. You know, Turek was a fellow employee of Garland and Morgan Stanley was the employer of Garland. And they were dismissed in July and they were dismissed from the case. Had this not been ruled on and gotten 304A language already, we wouldn't have this appeal in those cases because they were already out. They're here arguing because it's possible that that appeal brought by Garland could be reversed. And that's why they're here. If it's not reversed, there will be no cross claims. And that's the setting that we're at and that's where we want to work the court. And that's the settlement and the impact of it. Okay, I'd like to return to some of the things that have been discussed. Specifically, I'd like to talk about just the facts of the case a little bit and whether they matter or they don't matter. A lot of arguments have taken place about the facts. You know, this case was ruled out as a matter of law. It was a blanket protection given and it wasn't specific to the facts. The judge had the facts given to him, but he didn't base his ruling on the facts. A lot of people have argued the facts to this court, but, you know, we do take the facts, all well-plaid facts, as true for this motion. And for this ruling, what they say is presumed to be true. What they're saying is that it was negligent teaching or negligent instruction and it's the nature of the claim that we're looking at. Now, we rebutted their facts in our briefs, and I'll do a little bit of rebutting here, but it's not really relevant to facts. The only reason I'm rebutting is to try to tell the court it's not all one-sided under the facts. And here are the facts that I would like to rebut that have come up today. They're not important because this is a matter of law, but why they need to be rebutted. The word specific training. It's specific training, and because it's specific training, therefore it shouldn't be entitled to educational health practice protection. Well, in airplanes, in aviation, everything is specific training, and that's what occurred here. There are three entities before you who are training facilities. One of them is GLASS. GLASS is a simulator facility that gave instrument training, training specific to instrument flying. They actually reached the point where they certified Mr. Turek again, which has to be done every six months, again and again. They certified him in the fall before the crash that he was sufficiently trained and properly trained, competent to be an instrument pilot, and that was done by a certified flight instructor or AERO, and that's why they're being sought here. They were involved shortly before. The next training facility is RTC, and they're here. It's across Kelly, and RTC has a specific type of training too, and that specific training they did is specific to this airplane, a Cessna 421B course. They had approval from the FAA to teach a specific course on a specific plane and a particular model of that airplane, and at the completion of it, they give a certificate, and that certificate was issued to the insurance company that that training had been completed. The reason the insurance company matters is because you've got to be insured if you're going to fly the plane. That's good common practice, but it's also important because it's not required by the FAA. This is extra training, and it's an important point because Mr. Turek is already totally legal under FAA rules to fly the plane, but he did additional training both at GLASS and at RTC. Well, that training at RTC was completed with a certificate about nine days before the crash. In the week before the crash, Mr. Howard Levinson, who is my client and the subject of this appeal, arguing that there should be no different treatment to him, flew with him additionally. He flew with him additionally, and the three entities together make a picture, and that picture is the type of training received by this individual. And one certified him to be an instrument pilot, and this was an instrument flight. The second certified him as being competent to operate and know the peculiarities of a Cessna 421B. That's RTC. And then comes Howard Levinson, who actually, not in a simulator, but in the airplane, flies with him for the required amount of hours. Well, all three of those things were required by the insurance policy, so it's a quilted pattern of training required not by the FAA, but by an insurance policy. When people here argue that this training was pursuant to the sale of an airplane, that's simply not supported in the record. There wasn't the sale of the airplane, and the training already took place. In fact, it's very clear in the record that it was unknown whether there was going to be a sale of the plane. It was to be determined as one of the reasons that people were aboard the plane. It wasn't known whether there was going to be a sale. The training was pursuant to the insurance to allow him to fly the plane, whether he bought it, bought into it, rented it, or borrowed it. Mr. Levinson and Mr. Turek were personal friends. That's supported by the record, C-475. They're personal friends. Mr. Levinson had given prior flight instruction to Mr. Turek years earlier on many separate occasions because they were personal friends. He gave instruction to Mr. Turek in Mr. Turek's own airplane, not necessarily for 421 at all. He also gave instruction to Mr. Turek in another 421 a couple years before. He does not just give specific training. He is his friend, and he is a flight instructor, so he flies with him. But on this occasion, he's the third in a series of three entities that had effect on his pilot before the fatal crash. It would be unfair for Mr. Levinson to be called to task for his training without him being able to call in and put before the jury the other two entities that he relied upon. If you're the third one that's going to give the man training or going to observe him, you're relying on the fact that you know he went to these other two entities. You know he graduated from those entities. You know there was a certificate from those entities. That's why I asked that question earlier. Right, and I thought it was a very good question, and I like how Mr. Ware answered it, which is there's no real difference. I think your question was about is there any real difference between the tutor, the person that sets up their own business, versus Lewis University. Is that the one you're referring to? Yeah, I don't think there's any difference. The tutor is enhancing what was done by the institution. It would be unfair to judge the tutor and not let the tutor talk about the institution or not bring in the institution. The other thing that's really important under the facts here is that nobody's really told you what this crash was caused from. And, of course, it's a question of fact. We don't know. Who was flying? Pardon? There's a footnote in one of the briefs about who was flying. Yeah, and I'm not going to say that I know, because of course that's not right, but we assume in this appeal that Mr. Turick was flying because that's the claim. The claim is that he erred when he flew. And the reason he erred is because of the training given to him. So it's an assumption. It's a logical assumption here on this appeal that if he's found to have been flying, then his fault is the fault of his teacher, because the fault of his teacher to him isn't relevant if someone else is flying. So that's the assumption is that he's flying. In fact, one of the claimants here is Mr. Turick himself. Mr. Turick himself here is obviously here wanting to make the claim. He's the negligent party. He has to presume he's the negligent party to be making this claim, saying you didn't teach me. You didn't teach me well. Well, this is exactly why education while in practice needs to be given also to Howard Levinson, because whether it's RTC, whether it's glass, you have to climb into the head of Mr. Turick to know what he did or why he did what he did. First of all, we have enough trouble knowing what did he do because the plane is destroyed. That's why there's not really a true knowledge of who was flying. The plane was destroyed. Nobody was there. No one lived who was in the airplane. There's factual circumstances that indicate this, and there's factual circumstances that indicate that. But assuming he was flying, why did he make this mistake? What mistake? Well, assuming it was simply banking too steeply, which is one of the allegations, very likely true allegation, why did he do that? Did he do that because he was distracted? Did he do that because he'd had an argument? Did he do it because he was tired? Why did he do it that day when 1,200 hours in prior flying for nine years he didn't do that? He did it this day, but he didn't do it in all those prior times. Why not? Is that because of the teaching that Howard Levinson gave him on the Friday before? Why is that making him do it now and he didn't do it in all those other times? The reason I say 1,200 is he has 1,200 hours. His airplane was based at that airport, the airport he crashed coming to, so he'd made that kind of approach to that airport many, many times. It's just simple logic. The airplane has to land there every single time he comes home. He's done this many, many times. How to turn the airplane when you're making a landing is like the first grade. Learning to fly a twin engine is like the fourth grade. Learning to fly a bigger twin engine in instrument conditions is like the eighth grade. Howard Levinson is like freshman year in high school. He's giving them the polish there. It really is. Well, how can you judge what the freshman year course is about and how it did without coming in and talking about the first grade, the fourth grade, the eighth grade? An important point needs to be made here. You know, he cannot go to RTC and take their course unless he's already an instrument-rated pilot for twin engine aircraft. It's presumed as an entry requirement. Well, this error here made is basic flying. So I'm arguing the facts, but I'm saying that it's not fair to start judging his training unless you're going to bring in all the trainers and you're going to see all the training, because truthfully, you're going to hear, the jury would have to hear about basic training. Why did he make this mistake? And I also want to mention, in the briefs, a lot of times these facts are argued by it's a logical assumption. It's a logical assumption that since they went over landings when they flew the week before and this was a landing accident, that some of that training may have impacted and caused the accident. You know what? That's all the evidence would ever be here, because there's nothing else. And how would you ever know why he made that mistake? And I think that's the key to why there's an educational malpractice doctrine. Every time you're judging why somebody did something later, to say it's because of the teaching, how do you know? And I think that's what the Ross Court was saying in Public Policy Number 3. The difficulty of proximate cause. How will a jury really know the reason the person did it that day? Or are they going to do the same thing? Are they going to really say, well, it's a logical, it follows logically, it's a logical presumption that since they discussed it or they dealt with it the day before, they did landings. Well, of course they've got to do landings. They have to land. So why does it make it the last instructor's fault and no one else? And is it maybe all of the others? Maybe all of them should have emphasized that more, the turning when you're landing. And that's the type of cases that would be allowed. And that identifies why not only shouldn't you allow it, but you shouldn't distinguish between, because it's the same for a flight instructor the Friday before as for the institution that's saying the same thing nine days before or for the institution that did it three months before. How do you know which one of those influenced him? Or why he didn't follow what he was taught? Or whether it was because of why he was taught? You'll never really know. And I think that's the doctrine. If we go to the Glorvigan case in Minnesota, I think it's such a great case that we rely on it heavily. You're not bound by it. I just would direct you to the logic of it. It discusses all of the issues that we've had here today. It really discusses why educational malpractice is appropriate. And the same arguments were made there and rejected that have been made here, and good logic as to why. And the argument was that educational malpractice there should be allowed because it was connected to the sale of an airplane, and they rejected that. And they said, you've got to look at the claim. The claim here is for bad teaching. Yes, you might have an action for the sale of the airplane. That's something different. Here, there was an action for the sale of the airplane. That's something different. That's not here before you. That was elsewhere. Yes, it's true it was lost by them, but they took an appeal on that, and that's been stayed. That's going to come up is the negligent entrustment. One of the quotes I want to really mention real clearly on that that we've given to you is that this is different because it's to him to use. It's about giving the plane to him, meaning Turek, to use. That's negligent entrustment. Giving a person a plane to use is negligent entrustment. That's not teaching him. That's letting him take it if he's fully trained by anybody, whoever did the training, determining whether he's fully trained. That, in another count, was made and is a claim elsewhere. Now, it was rejected, but that's not for you, other than eventually that appeal will come here. But that's not what's before you. What's before you is specifically the training, not negligent entrustment. So the whole factual argument about this has something to do with the guy going to use the plane doesn't make any difference. The whole factual argument about his specific training doesn't make any difference. What makes the difference is the need for the court and the juries to get into the head of the person and know why. One final example. We sometimes run stop signs accidentally. You know what? We do it. And you know what? We do it and we can't understand why we did it. I've done it. I hate to say it. I've done it accidentally or I've done it. And you know what? Is it because I wasn't trained to? Or is it because that day there was something specific about me and I did something that's really basic? I ran a stop sign. A lot of times nothing happens. Sometimes an accident can happen. If the accident happens, is that the trainer's fault? First of all, it's my fault for sure. I ran a stop sign. But is it the trainer's fault also? That's what we're considering here. Is it the trainer's fault also? And that's what it's about. Also. And is it the trainer's fault? And how would you determine it's the trainer's fault? You have to go back and look at that training. And you have to look at what the Ross court says specifically. So you have to look at what he was like during the training. His receptiveness. His attentiveness. His ability to absorb it. That's his mind at the time of the training. And then you've got to get into his mind at the time he ran a stop sign. How would anyone ever know? And that's why I think the protection is here. And that's why I think it's deserved. And that, I would submit, is why there should be no difference between them. Okay, thank you. Thank you. Counselor, your name again for the record. Oh, it is the owner. Oh, it is the owner. Howard Levinson. Now you get your. All right. Thank you, Your Honor. Thank you, Counsel. Now you've got about an hour. I'll try to keep it as short as possible. I don't know if you've ever been here when Joe Gordon won that day. I was here the day we were here, and it was four and a half hours. And another justice handed me a note and said she's leaving. She literally got up and left. Some points, a lot of points were raised. That wasn't to slow you down. That was just to lighten things up. A couple points. The question was asked, how do you distinguish Turek from other flight instructors? A couple points there. The only in-flight training, physically manipulating the controls of this specific aircraft, was provided by Howard Levinson to Mark Turek. Taught him the approaches and landings at the airport where this aircraft crashed outside of. That training was provided by Mr. Levinson. Proximity and time. This training was done two to three weeks before the accident. Again, with physical manipulating the controls of the actual aircraft. Particular knowledge. Howard Levinson mentioned in his deposition, it's in our brief, page 446 of the record, volume two, that the engines were temperamental. My co-counsel Ed Matuschik had mentioned about the geared engine issue. We have to be careful because of the touchy engines. So in addition to being a flight instructor, because he owned the aircraft, he had particularized knowledge regarding the handling characteristics of that aircraft. That makes him different from other instructors generally. The second point I wanted to bring up. The case of Lewis v. Spagnola, an Illinois Supreme Court case, was referenced. Lewis v. Spagnola is not an education malpractice case. What it is, was parents brought a suit against the state of Illinois, against St. Louis School District 189, because they were upset with the quality of a public school education and brought a suit under the education article of the Illinois Constitution. It dealt with standing under the Illinois Constitution and dealt with whether they could have a claim for the quality of public education. Again, think of the Ross case that we've talked about at length. Again, there's a difference between cases involving the quality of public education generally, universities, schools generally, and concerns about economic harm and such, versus cases like this one, where there's training provided three weeks beforehand on an aircraft, and we're not dealing with economic harm, but we're dealing with a death case. It's very different in terms of the Burger King factors. Here, harm is foreseeable. If you don't train somebody properly on an aircraft, it is foreseeable, particularly if that training is done three weeks beforehand, that harm can result. And the magnitude of the risk is significant. It can be death. Another case that I think the court should take a look at, people have argued that negligent training and instruction isn't allowed in Illinois. It is. The Longnecker case is a Med-Mal case. I'll just give you the citation. It's 383 L.F. 3rd 874, and I direct the court to page 896. In that particular case, there was a suit against a hospital as well as a doctor relating to a heart transplant, and there was a direct institutional negligence training case against the hospital for not training the doctor properly regarding care of the replacement organ. And this court affirmed in 2008 the jury's finding against that hospital for failing to train and instruct that doctor. I heard a lot of arguments today about how specialized and particularized the training is in the aviation context. Every day, Cook County juries weigh in in medical malpractice cases, which has some of the same complexities and same particularized training, and this court has weighed in and has allowed those claims to go forward. Just because this case is in the aviation context and there's allegations of negligent training and instruction, similarly, it should not be taken away from the jury. There's a lot of questions in some positions. Why? What happened? How? That's the subject of expert testimony, and juries can sort that out. They do it every day. Regarding the mention of settlement, if documents are finalized, we will advise the court, and I think that's the appropriate way to handle it from here forward. The bottom line, Your Honors, to us is the battle line that I think needs to be drawn here. Is Illinois going to insulate and shield negligent conduct simply because it occurs in a training setting, even if that results in physical harm? Morgan Stanley and the other appellants urge this court that in terms of drawing that line, if you're going to address the educational malpractice doctrine, that line should be kept around traditional educational institutions in dealing with economic harm. It should not be expanded to encompass cases like the present case involving physical harm. Thank you for your time. Thank you, each one of you. Let's put it this way. I'm still wide awake, so you guys really made a good presentation, but each of you thoroughly represented your clients, and I'm impressed. These are some of the best attorneys I've seen in my nine and a half years here. Thank you.